UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


David Bisson and Suzanne Brosseau,

      Plaintiffs,

      v.                                                        Civil Action No. 2:13-cv-245

Jeremy Reppel, Alycia Horn, and
Joseph Yared,

      Defendants.


**<u>OPINION AND ORDER</u>**
(Docs. 67, 89, 97)

This diversity action stems from an April 2012 fire that destroyed a garage and

dwelling on property that Plaintiffs David Bisson and Suzanne Brosseau (the "Bissons")

were leasing to Defendants Alycia Horn (now Alycia Reppel) and Jeremy Reppel (the

"Reppels").  According to the Amended Complaint, the Reppels had allowed Defendant

Joseph Yared to reside at the property in violation of the lease, and the fire was caused by

Yared's attempt to charge a car battery in the garage.  (Doc. 36 at 3–4.)  The Bissons

allege that Yared had left the charger attached overnight.  (*Id.* at 3.)

Previously in this case, the Court dismissed the Bissons' negligence and negligent-

supervision claims against the Reppels.  (Doc. 21.)  The remaining claims are the

Bissons' negligence claim against Yared, and their breach-of-contract claim against the

Reppels.  In an April 2, 2014 ruling (Doc. 35), the Court granted the Bissons' Motion to

amend their contract claim, and the Bissons thereafter filed an Amended Complaint that

includes an express contractual-indemnification claim against the Reppels (Doc. 36).

Defendants filed Answers to the Amended Complaint, asserting—among other things—

the defenses of failure to mitigate damages, setoff, and the implied-coinsured doctrine.

(Doc. 42 at 5; Doc. 48 at 5.)[1]

Several motions are currently pending in this case.  The Bissons have filed a

Motion in Limine re: Evidence of Insurance Regarding Fire Loss and Motion to Strike

Defendants' Affirmative Defenses re: Setoff and Implied Co-Insured Doctrine

(collectively, the "Insurance Motion").  (Doc. 67.)  While the Insurance Motion was

under advisement, the Reppels filed a Motion for Summary Judgment (Doc. 89).[2]  All

parties have consented to direct assignment to the undersigned Magistrate Judge.  (Docs.

2, 7, 16.)  For the reasons stated below, the Bissons' Insurance Motion (Doc. 67) is

GRANTED, and the Reppels' Motion for Summary Judgment (Doc. 89) is DENIED.

## Background

Except where noted, the following facts are undisputed for present purposes.  The

Bissons were the owners of a rental property consisting of a two-bedroom dwelling unit

and a detached garage located at 118 Rail Road, Colchester, Vermont.  The Bissons used

---

[1]  The Reppels also filed a Cross-Claim for implied indemnity against Yared.  (Doc. 42.)  In an Opinion and Order filed on July 9, 2014, the Court denied Yared's Motion to Dismiss the Cross-Claim, although the Court explicitly declined to rule on whether the Reppels, if found to be contractual indemnitors, could assert a claim for implied indemnification against Yared.  (Doc. 63 at 7–8.)

[2]  The Bissons' "Statement of Additional Undisputed Material Facts" (Doc. 94-1 at 6–8) in opposition to the Reppels' Summary Judgment Motion precipitated an objection from the Reppels and ultimately a Motion from the Bissons (Doc. 97) to Substitute Amended Responses (Doc. 97-4) to the Reppels' statement of undisputed material facts.  The Reppels request that the Court disregard the Bissons' proposed amended responses to paragraphs 3, 9 and 15.  (Doc. 101 at 1.)  The Bissons' Motion to Substitute (Doc. 97) is GRANTED with respect to the amended responses to which the Reppels do not specifically object—that is, all of the responses except for Nos. 3, 9, and 15.

the property as a rental property continuously between 2000 and the date of the fire.  On

April 20, 2011, the Reppels entered into an Agreement of Lease (the "Lease") with the

Bissons to rent the property for the period of May 1, 2011 to June 30, 2012.

The ten-page Lease includes the following material terms.  The preamble states

that "You and Owner admit that all agreements between You and Owner have been

written into this lease."  (Doc. 90-2 at 2.)  Under a "purpose and occupants" clause:

> The premises shall be used as a personal residence only, and not otherwise,
> for a total of 2 occupants.  Only the following persons shall be considered
> tenants of this apartment under this lease: NAME: Alycia Horn and Jeremy
> Reppel.  No other persons may reside at the premises unless approved by
> Landlord in writing.

(*Id.*)[3]  The rent was $1,200 per month.  (*Id.* at 2.)  The Lease provides for a $1,200

security deposit, which the landlord could retain for, among other things, "damage to the

property of the Landlord unless the damage is the result of normal wear and tear or the

actions or events completely and totally beyond the control of the Tenant."  (*Id.* at 3.)

The Lease includes a provision prohibiting the tenants from doing "anything in or

about the premises which might increase the insurance premiums on the building."  (*Id.* at

4.)  The Lease also includes a yield-up clause that requires the tenants to "leave the

premises, and the improvements therein, in the same conditions as at the commencement

of this Lease, reasonable wear and tear is excepted."  (*Id.*)  Other pertinent Lease

provisions include the following:

---

[3]  A similar provision appears later in the Lease: "Tenant shall not assign, mortgage, pledge or
encumber this Lease, or the demised premises, or sub-let the whole or any part of the demised premises
without Landlord's written consent."  (*Id.* at 6.)

REPAIRS AND MAINTENANCE:  Landlord shall be responsible for all repairs and maintenance with respect to the premises except such repairs and maintenance as are caused by the negligent or deliberate act or omission of the tenant or any other person on the premises, and except for such repairs specifically excluded elsewhere in this Lease.  Those repairs and maintenance which are the responsibility of the Tenant shall be performed by the Tenant immediately upon demand of the Landlord.  Whether such repairs and maintenance are performed by the Tenant or the landlord, the cost of such repairs shall be paid by the Tenant as additional rent. . . .

(*Id.* at 5.)

FIRE OR CASUALTY DAMAGE:  If the premises are substantially damaged or destroyed by fire or other casualty so that [the] premises are largely unusable, Tenant may immediately vacate the premises and notify the Landlord within fourteen days of Tenant's intention to terminate [the] Lease.  In such a case, this Lease shall be terminated as of the date that the premises are vacated and all keys are returned.

(*Id.* at 6.)  A clause entitled "tenant property" requires the tenants to protect their personal property with "adequate personal property insurance," and further provides that the "Landlord shall not be liable for loss of, or damage to Tenant property by reason of leakage of water, gas, fire, or from any other cause, including theft."  (*Id.*)  A "hold harmless" clause states: "The Landlord shall not be liable to and the Tenant shall hold the Landlord harmless and indemnify the Landlord from injury or damage to persons or property occurring in or about the leased premises, unless caused by or resulting from the negligence of the Landlord."  (*Id.* at 7.)  A "joint and several liability" clause states: "All the tenants hereunder are jointly and severally liable for the performance of all of the obligations hereunder."  (*Id.* at 8.)

The following additional facts are not material to interpretation of the Lease, but are necessary as background regarding events giving rise to this litigation and the parties'

arguments.[4]  In October 2011, the Reppels agreed that, in exchange for monthly rent

payments, Yared could reside at the property beginning in November 2011.  The Reppels

did not ask the Bissons for approval to allow Yared to reside at the property.  On

April 29, 2012, the property was destroyed by fire.  Two fire investigators later

determined that the fire originated in the garage in the immediate vicinity of Yared's

Porsche 911, where a battery charger had been in use.  (*See* Doc. 94-6 at 1, 3.)  Yared

was the only person at the property at the time of the fire.

On May 17, 2012, Alicia Horn (now Reppel) emailed Suzanne Brosseau and

stated, among other things: "According to the lease, we do not need to pay you the June

rent because of the fire, correct?  Just want to make sure."  (Doc. 90-6 at 3.)  Suzanne

Brosseau replied the same day, stating: "No, you would not be paying any[ ]more rent."

(*Id.* at 2.)

At the time of the fire, the Bissons were carrying a policy of fire insurance (the

"Policy") with the Peerless Insurance Company ("Peerless").  (Doc. 90-5 at 2.)[5]  The

Policy limits included $141,000 for the dwelling and $67,100 for the garage.  (*See id.*)

The parties agree that Peerless has waived subrogation; Plaintiffs in this case are the

Bissons themselves.

---

[4]  The only disputes regarding the facts set forth below are that the facts are not material to interpretation of the Lease.  The Court includes the following facts solely for the purpose of supplying necessary background; they play no role in the Court's interpretation of the Lease.

[5]  There was some suggestion at a hearing on November 3, 2014 that another company, Safeco, had the rights or was involved.  For simplicity the Court simply refers to the insurer as Peerless.

**<u>Analysis</u>**

In their Motion for Summary Judgment, the Reppels argue that the Bissons'

breach-of-contract claim fails as a matter of law for three reasons:

> (1) under a plain reading, the Agreement of Lease does not impose liability
> on tenants for damage to the property from a fire beyond their control or
> resulting damages not reasonably foreseeable at the time of contracting; (2)
> the Agreement of Lease cannot do so as a matter of law under the Vermont
> Residential Rental Agreement Act, 9 V.S.A. §§ 4451–4469a (the
> "VRRAA"); and (3) Plaintiffs' insurance was for the parties' mutual benefit
> and, accordingly, the breach[-]of[-]lease claim is barred by the implied co-
> insured rule.

(Doc. 89 at 1.)  In response, the Bissons maintain that the Lease terms entitle them to

pursue recovery, and that neither the VRRAA nor the implied-coinsured doctrine bars

their claims.  (Doc. 94 at 1, 14, 16.)  The parties' arguments regarding the implied-

coinsured rule appear principally in their filings related to the Bissons' Insurance Motion.

After setting forth the applicable legal standards, the Court addresses each of the

Reppels' three arguments for summary judgment in turn.

**I.      Legal Standards**

**A.      Summary Judgment**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is

appropriate "if the movant shows that there is no dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding whether there is a

genuine issue of material fact, "[a]ll reasonable inferences must be construed in the

nonmoving party's favor."  *Hill v. Curcione*, 657 F.3d 116, 124 (2d Cir. 2011).  Summary

judgment is granted only when "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### B.    Construction of a Lease

As the Court previously noted (Doc. 35 at 6), the substantive law of Vermont applies in this diversity case. In Vermont, the "master rule" in the construction of written agreements (including written leases) "is that the intent of the parties governs." *Hall v. State*, 2012 VT 43, ¶ 21, 192 Vt. 63, 54 A.3d 993 (quoting *Main Street Landing, LLC v. Lake St. Ass'n*, 2006 VT 13, ¶ 7, 179 Vt. 583, 892 A.2d 931 (mem.)). "In discerning the intent of the parties, the court must consider the written document as a whole." *Id.* "[T]he first task of the court is to determine whether the language is ambiguous, which is a question of law." *Mueller v. Mueller*, 2012 VT 59, ¶ 20, 192 Vt. 85, 54 A.3d 168. "If the contract language is ambiguous, its interpretation is a question of fact to be determined on all the evidence, including extrinsic evidence, to determine the intent of the contracting parties." *Id.* Specific contract terms control over more general terms. *See Fairchild Square Co. v. Green Mountain Bagel Bakery, Inc.*, 163 Vt. 433, 439, 658 A.2d 31, 35 (1995).

## II.    The Lease Language is Unambiguous

The Reppels' first argument for summary judgment is that the Lease is unambiguous and does not impose responsibility on them for damage caused by an accidental fire beyond their control. (Doc. 89 at 4.) The Bissons maintain that the plain

7

language of the Lease obligates the Reppels to indemnify the Bissons for the fire loss.

(Doc. 94 at 19.)  The Court examines the parties' arguments in detail below.

### A.      "Fire or Casualty Damage"

The Court begins with the "fire or casualty damage" clause; as stated above, that

clause provides as follows:

> FIRE OR CASUALTY DAMAGE:   If the premises are substantially damaged or destroyed by fire or other casualty so that [the] premises are largely unusable, Tenant may immediately vacate the premises and notify the Landlord within fourteen days of Tenant's intention to terminate [the] Lease.  In such a case, this Lease shall be terminated as of the date that the premises are vacated and all keys are returned.

(Doc. 90-2 at 6.)  The Reppels contend that the "fire or casualty damage" clause is a

specific provision that controls over other provisions like the yield-up, hold-harmless,

and "repairs and maintenance" clauses.  (*See* Doc. 72 at 12; Doc. 89 at 6, 8, 11.)

According to the Reppels, the "fire or casualty damage" clause does not impose liability,

but instead "permits the tenant to vacate the premises in the event of destruction by fire

and terminate the lease and all obligations under the lease agreement."  (Doc. 89 at 11.)

Citing the May 2012 email exchange between Alicia Horn and Suzanne Brosseau, the

Reppels assert that their obligations under the Lease were in fact terminated by the fire.

(*See* Doc. 90 at 3, ¶ 16.)

It is certainly true that the parties to a lease can set specific rules for fire damage

that control over more general rules establishing a tenant's liability for negligence.  *See*

*Fairchild*, 163 Vt. at 439, 658 A.2d at 34–35 (specific "fire insurance" provision waiving

right of recovery for loss by fire controlled over more general provisions establishing

tenant's liability for its negligence).  However, assuming that the Reppels did in fact exercise their option to "terminate the Lease" under the "fire or casualty damage" clause, the effect would be to terminate the *tenancy*, not to extinguish all obligations incurred during the Lease term.  *See* 9 V.S.A. § 4467 (discussing termination of the *tenancy*); Restatement (Second) of Property, Landlord & Tenant § 1.7 cmt. a (same); *id.* § 12.1 cmt. g and reporter's note 7 ("The rule of *Comment g*, which ends all obligations for rent after any termination of the lease, does not terminate all obligations to pay money to the landlord."); *see also Wis. Mall Props., LLC v. Younkers, Inc.*, 2006 WI 95, ¶ 34, 293 Wis. 2d 573, 717 N.W.2d 703 ("The termination of a lease would not ordinarily be expected to extinguish an existing cause of action for a breach of the lease."); 2 Milton R. Friedman, Friedman on Leases § 16:3.1, at 16-56 (5th ed. 2014) ("[T]he end of the lease ends liability under the covenant to pay rent, but not for any liability theretofore accrued nor for any liability then or thereafter accrued for damages for breach of the lease." (footnote omitted)).

Unlike the "fire insurance" clause in *Fairchild*, the "fire or casualty damage" clause in this case contains no waiver of rights to recovery, and otherwise specifies no rules regarding allocation of responsibility for damages resulting from fire or for purchasing fire insurance.  The Reppels assert that any provision imposing liability on them for fire damage or requiring them to carry fire casualty insurance would "logically" belong in the "fire or casualty damage" clause.  (Doc. 72 at 10.)  If the Lease contained no other terms, that argument might be persuasive.  It is necessary, however, to refer to the other terms of the Lease.

**B.** **"Hold Harmless"**

The Bissons and the Reppels each assert that the Lease's "hold harmless" clause is unambiguous.  As stated above, that provision is as follows: "The Landlord shall not be liable to and the Tenant shall hold the Landlord harmless and indemnify the Landlord from injury or damage to persons or property occurring in or about the leased premises, unless caused by or resulting from the negligence of the Landlord."  (Doc. 90-2 at 7.) According to the Reppels, the "hold harmless" clause "unambiguously requires Tenant to indemnify and hold the Landlord harmless only against injury or damage *to persons or property* occurring *in or about* the leased premises."  (Doc. 89 at 7 (internal quotation marks omitted).)  The Reppels assert that the provision "says nothing about injury or damage *to* the leased premises," and does not "cover claims *by* the Landlord for damage *to* the leasehold premises."  (*Id.*)  The Bissons insist that the "hold harmless" clause "requires the Reppels to indemnify the Bissons for property damage occurring in [or] about the leased premises, which includes damage to the dwelling and garage structures that were owned by the Bissons."  (Doc. 94 at 4 (internal quotation marks omitted).)

For the reasons the Court previously stated (*see* Doc. 35 at 9–10), the Court rejects the Reppels' suggestion that the "hold harmless" clause does not apply to damage *to* the leased premises.  The Bissons continue to rely on *Preserver Group v. Bragin*, 2007 WL 2593089 (N.J. Super. Ct. App. Div. Sept. 11, 2007) (per curiam), for the proposition that the "hold harmless" clause's reference to damage "in or about the leased premises" includes damage *to* the leased premises.  (*See* Doc. 94 at 7–8.)  The Reppels have cited no contrary authority, and the Court has found none.  Rather, as the Court previously

10

observed (*see* Doc. 35 at 10): since the Lease defines the leased premises as "118 Rail Road at Mills Point Colchester, VT 05446" (Doc. 90-2 at 2), the "hold harmless" provision covers damage within the parcel described by that street address—including damage to the improvements on the parcel.

The Reppels argue that this conclusion could only be reached by rewriting the "hold harmless" clause to add the language "or the premises itself" after the phrase "in or about the leased premises." (Doc. 89 at 8.) It is true that, generally, the Court's task does not extend to rewriting the parties' contract. *See Mann v. Adventure Quest, Inc.*, 2009 VT 38, ¶ 18, 186 Vt. 14, 974 A.2d 607 ("Our duty is to construe the policy as it is written and not to rewrite it using language we can more easily construe."); *Travelers Indemnity Co. of America v. Deguise*, 2006 VT 87, ¶ 12, 180 Vt. 214, 914 A.2d 499 ("[W]e cannot conclude that it is the role of this Court to rewrite the parties' agreement . . . ."); *B & R Oil Co. v. Ray's Mobile Homes, Inc.*, 139 Vt. 122, 123, 422 A.2d 1267 (1980) ("We will not attempt to rewrite the clear unambiguous language of the lease agreement."). However, the Court's conclusion flows from the plain language of the "hold harmless" clause; no rewriting is necessary.

The Reppels also argue that the "hold harmless" clause does not cover claims *by* the landlord against the tenant. (Doc. 89 at 7.) According to the Reppels, a landlord "would never need a hold harmless agreement to cover claims the Landlord might [have] against the tenant, rather an[] express liability provision would be needed, which is absent from the Agreement of Lease." (*Id.* at 8.) The Reppels assert that the intent of the "hold harmless" clause is to hold the Bissons harmless for claims asserted against the

Bissons "by *others* for damage to persons or property occurring in or about the premises unless caused by the Plaintiffs' own negligence." (*Id.* at 8.)  The Bissons maintain that the "hold harmless" clause explicitly contains both "exculpatory" language to protect them from claims by third parties, *and* indemnity language obligating the Reppels to indemnify them for property damage.  (Doc. 94 at 8–9.)

No extended analysis is necessary on this point: there is no indication in the "hold harmless" clause that it is limited only to claims asserted against the Bissons by individuals other than the tenants.  Indeed, the ordinary definition of the verb "indemnify" is "[t]o reimburse (another) for a loss suffered because of a third party's *or one's own* act or default."  Black's Law Dictionary 886 (10th ed. 2014) (emphasis added).  Again, this conclusion flows from the plain language of the "hold harmless" clause; no rewriting of the Lease is necessary.

The Court was previously reluctant to rule on the precise effect of the "hold harmless" clause.  (*See* Doc. 35 at 10–11.)  The Court identified some arguments as potentially benefitting the Reppels on the hold-harmless issue.  (*See id.*)  Now, in the present procedural context with the benefit of a more complete record and argument from the parties, the Court concludes that those potential arguments are not persuasive.[6]

In particular, the Court previously remarked that it would have been simple to add a provision in the "hold harmless" clause making it explicit that the clause included

---

[6] Notably, as outlined below, this conclusion requires analysis of other terms in the Lease.  It was for that reason that the Court was previously cautious not to attempt to interpret any clause of the Lease in isolation, and ultimately concluded only that the "hold harmless" clause was "not inconsistent with an interpretation of the lease that shifts liability for fire damage to the tenants."  (*Id.* at 11.)

damage "to" the leased premises, or even an explicit provision regarding the issue of liability in the case of fire.  (*Id.* at 10.)  However, just because the Lease could benefit from more explicit drafting[7] does not necessarily mean that it is ambiguous.  *See Ali v. Fed. Ins. Co.*, 719 F.3d 83, 93 n.17 (2d Cir. 2013) ("[T]he fact that one contract is even clearer than another does not make the other contract ambiguous."); *Yerdon v. Towery Pub., Inc.*, 749 F. Supp. 319, 322 (D. Me. 1990) ("Although the contract language is very poorly drafted, the Court finds that it is not ambiguous."); *In re Bailey*, 883 A.2d 106, 118 (D.C. 2005) (although agreement was poorly drafted, none of its provisions were ambiguous).

The Court also previously observed that the Lease included a specific caution for the tenants to obtain personal property insurance, whereas it contained no such explicit caution regarding fire and casualty insurance.  (Doc. 35 at 10–11.)  That issue is discussed below.

The Court also remarked that, if the "hold harmless" provision includes damage to the leased premises, that might create a conflict with the security deposit provision, which provides that at least some damages—such as those caused by "actions or events completely and totally beyond the control of the Tenant"—are not the tenants' responsibility.  (*Id.* at 10.)  The Court's concern was with the broad language of the "hold harmless" clause, since it does not contain a limitation similar to the limitation in the security deposit provision.  The Court now concludes that the "hold harmless" clause

---

[7] The Bissons concede as much.  (*See* Doc. 94 at 18.)

does not make tenants an insurer against all damage regardless of cause.  When read in conjunction with the "repairs and maintenance" clause, it becomes clear that tenants are not responsible unless the damage is caused by their or their guests' negligent or deliberate act or omission.[8]  *See infra*.

### C.      "Repairs and Maintenance"

The material provisions of the "repairs and maintenance" clause are as follows:

> REPAIRS AND MAINTENANCE:  Landlord shall be responsible for all repairs and maintenance with respect to the premises except such repairs and maintenance as are caused by the negligent or deliberate act or omission of the tenant or any other person on the premises, and except for such repairs specifically excluded elsewhere in this Lease.  Those repairs and maintenance which are the responsibility of the Tenant shall be performed by the Tenant immediately upon demand of the Landlord. Whether such repairs and maintenance are performed by the Tenant or the landlord, the cost of such repairs shall be paid by the Tenant as additional rent. . . .

(Doc. 90-2 at 5.)  The Reppels argue that the "repairs and maintenance" clause does not expressly impose any liability on them for anything, and that it "merely provides an *exception* to the landlord's general responsibility for repairs and maintenance necessitated by the negligent or deliberate acts or omission of other persons on the rented premises." (Doc. 89 at 10.)  The Bissons maintain that the "repairs and maintenance" clause "obligates the Reppels [to] repair damages caused *by their guests*." (Doc. 94 at 9.)

The Court previously remarked that the "repairs and maintenance" language constituted an "express" provision regarding responsibility for repairs. (*See* Doc. 35 at

---

[8] Tenants are also responsible for certain other repairs and maintenance as specifically stated in the Lease such as snow removal, lawn care, and smoke detectors.  (*See* Doc. 90-2 at 4, 8.)  None of those obligations are at issue here.

12.)  The Court also previously suggested (*id.* at 11) that the facts in *Travelers Indemnity Co. of America v. Deguise* are similar to the facts in this case.  In *Deguise*—a subrogation case—it was uncontested that the tenants were negligent in causing a fire at the leased premises.  2006 VT 87, ¶ 1.  The 21-page residential lease in that case included "numerous provisions establishing each party's obligations in great detail."  *Id.* ¶ 10.  A "hazards" clause provided:

> The Resident shall not undertake, or permit his/her family or guests to undertake any hazardous acts or do anything that will increase the development's insurance premiums.  If the unit is damaged by fire, wind, or rain to the extent that the unit cannot be lived in and the damage is not caused or made worse by the Resident, the Resident will be responsible for rent only up to the date of the destruction.  Additional rent will not accrue until the unit has been repaired to a livable condition.

*Id.* ¶ 6 n.1.  Another provision of the lease permitted the landlord to "retain tenants' security deposit to the extent necessary to pay for damages beyond normal wear and tear."  *Id.* ¶ 8.  A "damages" provision stated: "[w]henever damage is caused by carelessness, misuse, or neglect on the part of the Resident, a member of the Resident's household, or guests, the Resident agrees to pay . . . [t]he cost of all repairs . . . [and] [r]ent for the period the unit is damaged, whether or not the unit is habitable."  *Id.*

Examining those provisions, the Vermont Supreme Court reasoned that:

> The lease here, in express and unqualified language, obligates tenants to pay for the damage caused by their negligence.  In reviewing the lease as a whole, we cannot imply from the provisions that landlord intended to obligate itself to provide insurance for the benefit of tenants or to relieve tenants from liability for negligently damaging the leased premises, and we find nothing in the language of the lease that would reasonably lead tenants to imply a contrary intent.  While public policy considerations are helpful

15

in balancing the equities of the parties in light of the agreement they reached, we cannot elevate public policy considerations to override or contradict the terms of the parties' agreement.

*Id.* ¶ 10.

That analysis informs this case. It is true that, like the "hazards" clause in *Deguise*, the Lease in this case includes a clause obligating the tenants not to "do anything in or about the premises which might increase the insurance premiums on the building." (Doc. 90-2 at 4.) The Reppels argue that "[b]ased on this clause alone, a tenant could reasonably conclude that Plaintiffs purchased insurance for the parties' mutual benefit." (Doc. 72 at 10.) However, as the Supreme Court stated in *Deguise*, even if under such a clause tenants could expect the landlord to procure insurance on the building, the tenants could not "expect that the presence of insurance would relieve them of their responsibility to pay for damages caused by their negligence." *Deguise*, 2006 VT 87, ¶ 8.

The Reppels argue that the "repairs and maintenance" clause imposes no positive obligations on the tenants. Indeed, the "damages" provision in *Deguise* included a positive obligation to pay, whereas the first sentence of the "repairs and maintenance" clause appears to focus on what the *landlord* is (or is not) responsible for. However, the second and third sentences of the "repairs and maintenance" clause indicate that, in fact, the tenant does have affirmative responsibility for certain repairs and maintenance. Moreover, when read in conjunction with the "hold harmless" clause, the reason for the exception in the landlord's responsibilities is clarified: the landlord is not responsible for damages caused by the negligent or deliberate act or omission of the tenant or any other

16

person on the premises because the tenant agreed in the "hold harmless clause" to indemnify the landlord for such damages.

Of course, unlike the tenants in *Deguise*, the Reppels themselves were not negligent, but under the Lease the Reppels are responsible for damages caused by the negligent or deliberate acts of other persons on the premises.  Here, there is no suggestion that Yared deliberately caused the fire, but whether Yared was negligent has not yet been resolved.[9]  Moreover, no other language in the Lease would reasonably lead the Reppels to believe that the Bissons intended to obligate themselves to provide insurance for the benefit of the Reppels or to relieve the Reppels from liability.  As the Court previously concluded, the yield-up clause—conspicuously missing an exception for damage by fire—and the "hold harmless" clause are not inconsistent with an interpretation of the Lease that shifts liability for fire damage to the tenants.  (Doc. 35 at 11.)

### D.    "Tenant Property"

The Lease's "tenant property" clause requires the tenants to protect their personal property with "adequate personal property insurance," and further provides that the "Landlord shall not be liable for loss of, or damage to Tenant property by reason of leakage of water, gas, fire, or from any other cause, including theft."  (Doc. 90-2 at 6.) The Reppels contend that "absent an express requirement that tenant maintain fire casualty insurance, and the inclusion of the express requirement that tenant maintain

---

[9]  As noted above, the Reppels would not be responsible for damages to the property in all circumstances; indeed if Yared was not negligent then the Reppels would not be liable, either.  The Reppels' concern that they are being subjected to "strict liability" (*see* Doc. 98 at 2) is therefore unfounded.

17

*personal* property insurance, the Reppels' reasonable expectation was that Plaintiff would maintain fire casualty insurance for the parties' mutual benefit." (Doc. 72 at 9.) In their Surreply, the Reppels cite *Dix Mutual Insurance Co. v. LaFramboise*, 597 N.E.2d 622 (Ill. 1992), in support of that argument. (Doc. 81 at 2–3.) The Bissons maintain that *Dix Mutual* is distinguishable because it is a subrogation case. (Doc. 88 at 2.)

The Court rejects the Reppels' argument that this case should be governed by *Dix Mutual*. The material provision of the lease in that subrogation case provided: "The Tenant will assume their [sic] own risk for their [sic] personal property and Landlord, J.S. Ludwig, will not be responsible for fire, wind, or water damage." 597 N.E.2d at 624. The court found it "significant" that the parties had considered the possibility of fire and expressly provided for the tenant's personal property but not for the leased premises. *Id.* at 626. That fact, the court concluded, indicated that "the parties intended for each to be responsible for his own property." *Id.* The court held that "[u]nder the particular facts of this case, the tenant, by payment of rent, has contributed to the payment of the insurance premium, thereby gaining the status of co-insured under the insurance policy." *Id.*

*Dix Mutual* is similar to this case insofar as both cases involve residential leases (with greater than nominal rent) that do not explicitly assign responsibility for obtaining casualty or liability insurance, but that do require the tenants to protect their own personal property and exonerate the landlord for the loss of tenant property by reason of fire. According to the Reppels, with "the inclusion of the express requirement that tenant maintain *personal* property insurance, the Reppels' reasonable expectation was that Plaintiff would maintain fire casualty insurance for the parties' mutual benefit." (Doc. 72

18

at 9; *see also* Doc. 81 at 3–4.)  A similar argument apparently carried the day in *Dix Mutual*.[10]

Dix Mutual *is, however, distinguishable.  Under the terms of the Lease in this case, the Reppels were obligated to pay for damage caused by "the negligent or deliberate act or omission of the tenant or any other person on the premises."  (Doc. 90-2 at 5.)  No such term appeared in the lease in* Dix Mutual.[11]  Whatever the Reppels might have inferred about the Bissons' purchase of insurance, they could not have reasonably inferred that such insurance would exonerate them for fire damage caused by such negligent or deliberate acts or omissions.  *See Deguise*, 2006 VT 87, ¶ 8 (tenants could not "expect that the presence of insurance would relieve them of their responsibility to pay for damages caused by their negligence").[12]

---

[10]  Notably, the Vermont Supreme Court cited *Dix Mutual* in its opinion in *Joerg* for the proposition that a tenant's liability to the landlord's insurer for negligently causing a fire depends on the intent and reasonable expectations of the parties as ascertained from the lease as a whole.  *Union Mut. Fire Ins. Co. v. Joerg*, 2003 VT 27, ¶ 8, 175 Vt. 196, 824 A.2d 586.  Interestingly, the dissent in *Dix Mutual* asserted that the court had in fact departed from that rule.  *Dix Mutual*, 597 N.E.2d at 630 (Heiple, J., dissenting).

[11]  The court in *Dix Mutual* did note a common-law rule that was arguably analogous: "Although a tenant is generally liable for fire damage caused to the leased premises by his negligence, if the parties intended to exculpate the tenant from negligently caused fire damage, their intent will be enforced."  *Dix Mutual*, 597 N.E.2d at 625.  The concurrence in *Dix Mutual* asserted that the majority's holding "eviscerate[d] the common law principle that a tenant is responsible for damage to leased premises resulting from his own negligence."  *Id.* at 627 (Freeman, J., concurring).  Putting that aside, however, this case is still distinguishable from *Dix Mutual* because the rule obligating tenant to pay for negligently caused fire damage appeared in the Lease itself.

[12]  The Bissons assert that *Dix Mutual* is distinguishable because it is a subrogation case.  It is true that some courts have refused to apply *Dix Mutual* outside the context of subrogation.  *See Combs v. Schmidt*, 976 N.E.2d 659, 665 (Ill. App. Ct. 2012).  But *Deguise* was also a subrogation case, and the Bissons do not hesitate to rely on *Deguise*, nor does the Court.  The Court therefore simply notes that *Dix Mutual* was a subrogation case and this case is not, but does not rely on that difference for distinguishing *Dix Mutual*.

Finally, the Court rejects the Reppels' argument that the "repairs and maintenance" clause presupposes "the continued existence of the premises" and therefore does not apply to "total loss" by accidental fire. (Doc. 72 at 11–12.) The "repairs and maintenance" clause is unqualified as to the types of "repairs" for which the tenants might be liable, provided that the repairs are necessitated by the "negligent or deliberate act or omission of the tenant or any other person on the premises." Certainly the use of the word "repairs" does not preclude repairs necessitated by fire damage—indeed, the cost of "repairs" was the tenants' obligation under the "Damages" clause in *Deguise*. Other courts have adopted similar interpretations. *See Allstate Ins. Co. v. Fritz*, 452 F.3d 316, 321–22 (4th Cir. 2006) (lease imposing responsibility on tenants for "[a]ll costs for repairs or maintenance resulting from the reckless or negligent actions or omissions of Tenant or Tenant's guests or pets" unambiguously imposed obligation to pay "not only for routine maintenance but also for repairs of all kinds resulting from tenants' negligence").

### E.    "Purpose and Occupants"

It is undisputed that the Reppels breached the portion of the Lease that provided that no persons other than the Reppels "may reside at the premises unless approved by the Landlord in writing." (Doc. 90-2 at 2.) The Reppels argue that the damages resulting from the fire were not a foreseeable result of allowing Yared to be on the property, and thus those damages are not recoverable for the breach of the "purpose and occupants" clause. (*See* Doc. 89 at 12.) According to the Reppels, the only reasonably foreseeable damages for the breach of that term would be loss of potential additional rental income.

(*Id.* at 13.)  The Bissons argue that "[t]he Reppels cannot argue that the damages were unforeseeable, and they should be estopped from making this argument."  (Doc. 94 at 14.)  The Court does not evaluate the Reppels' foreseeability argument or the Bissons' estoppel argument.  Even if the Reppels prevail on their foreseeability argument regarding the "purpose and occupants" clause, they could still be liable for the damages caused by Yared's alleged negligence under other terms of the Lease.

### F. "Joint and Several Liability"

The Bissons assert that "Yared was de facto a tenant of the property, and the Reppels are therefore liable for his negligence based on the 'joint and several liability' provision in the lease and common law."  (Doc. 94 at 10.)  As noted above, the "joint and several liability" clause states: "All the tenants hereunder are jointly and severally liable for the performance of all of the obligations hereunder."  (Doc. 90-2 at 8.)  The Court understands the Bissons' argument to be that the common law and the "joint and several liability" clause supply an alternative basis for holding the Reppels liable for Yared's alleged negligence.  This alternative theory is that the Reppels created a sublease with Yared, and that "[i]n creating the sublease, the Reppels assumed contractual responsibility" for Yared's actions.  (Doc. 94 at 12.)  Because it concludes as it does, the Court does not address this alternative theory.

## III. The VRRAA

The Lease contains terms implied by Vermont's Residential Rental Agreements Act, 9 V.S.A. §§ 4451–4469a.  The VRRAA includes the following provision: "The landlord may retain all or a portion of the security deposit for . . . (2) damage to

property of the landlord, unless the damage is the result of normal wear and tear or the result of actions or events beyond the control of the tenant."  9 V.S.A. § 4461(b).  The Reppels argue that under § 4461, "events beyond the tenants' control should not be the tenant's responsibility under a Vermont residential lease."  (Doc. 89 at 14.)  The Bissons maintain that § 4461(b)(2) concerns security deposits, and has no relevance to the construction of the Lease.  (Doc. 94 at 15.)

On this issue the Court previously remarked that, "assuming that the security deposit provision speaks at all to the tenants' potential liability beyond the limit of the security deposit itself, it is no obstacle to imposing contractual liability upon the tenants." (Doc. 35 at 14.)  The Court now explicitly holds that, as its appearance in the section entitled "security deposits" suggests, § 4461(b)(2) speaks only to the retention of security deposits.  Nothing in that statutory provision suggests a legislative intent to preclude parties from allocating responsibility for damages resulting from fire or casualty.  Indeed, as the Court observed in discussing § 4457(a), if that were the case, then the "case-by-case" analysis in *Joerg* would make little sense.  (*See* Doc. 35 at 13.)

## IV.    The Implied-Coinsured Doctrine

The Reppels' third argument for summary judgment is their contention that the Bissons' insurance was for the parties' mutual benefit and that the breach-of-lease claim is therefore barred by the implied-coinsured rule.  This is the issue at the heart of the Bissons' Insurance Motion (Doc. 67).  In that Motion the Bissons rely on the collateral-source rule, arguing that it "prevents Defendants from introducing evidence of insurance regarding the fire loss and prohibits application of a setoff to any jury award obtained by

the Bissons." (Doc. 67 at 1.) The Reppels maintain that under a plain reading of the Lease, they are implied coinsureds, and that they are therefore legally immune from damages arising from the fire. (Doc. 72 at 1.)

Since the Insurance Motion focuses on the intersection of the collateral-source rule with several other legal doctrines, the Court begins by discussing those doctrines. Next, the Court discusses whether any Defendant is an implied coinsured and whether the collateral-source rule applies. Finally, the Court addresses Yared's arguments regarding the scope of the collateral-source rule and the evidentiary implications of the rule.

### A. Legal Doctrines at Issue

### 1. The Collateral-Source Rule

Vermont's collateral-source rule is part of Vermont's "substantive" law. *See Melo v. Allstate Ins. Co.*, 800 F. Supp. 2d 596, 598 & n.1 (D. Vt. 2011). In Vermont, the collateral-source rule, as a rule of damages, "operates to deny to a defendant a setoff for payment the plaintiff receives from a third, or collateral, source." *Windsor Sch. Dist. v. State*, 2008 VT 27, ¶ 32, 183 Vt. 452, 956 A.2d 528 (internal quotation marks omitted). "Most commonly applied where an insurance company has made a payment to compensate the plaintiff for his or her injuries, 'the collateral[-]source rule prevents the defendant wrongdoer from benefiting from the plaintiff's foresight in acquiring the insurance through any offsetting procedure.'" *Id.* (alteration in original) (quoting *Hall v. Miller*, 143 Vt. 135, 141–42, 465 A.2d 222, 225 (1983)). "While the rule may result in plaintiff's obtaining a double recovery, its essential purpose is not to provide the plaintiff

a windfall but to prevent the wrongdoer from escaping liability for his or her misconduct. *Id.* (citation and internal quotation marks omitted). The "wrongdoer" need not be a tortfeasor; the rule also applies to prevent parties in breach of contract from escaping liability. *Hall*, 143 Vt. at 143, 465 A.2d at 226.[13]

The collateral-source rule in Vermont is a rule of evidence in addition to a rule of damages. *Melo*, 800 F. Supp. 2d at 600. As a rule of evidence, the collateral-source rule precludes "'introduction of evidence regarding benefits a plaintiff obtained from sources collateral to the tortfeasor.'" *Id.* (quoting *Leitinger v. DBart, Inc.*, 2007 WI 84, ¶ 30, 736 N.W.2d 1). Again, in Vermont it is perhaps more appropriate to read "tortfeasor" as "wrongdoer," since the collateral-source rule applies to actions in contract.

## 2.    Subrogation and the Antisubrogation Rule

This case is not a subrogation case. If it were, then Peerless would be the named plaintiff and would be "standing in the shoes" of the Bissons and seeking to recover what it had paid to them under the Policy. *See Joerg*, 2003 VT 27, ¶ 6 (describing doctrine of subrogation). However, under the "antisubrogation rule," Peerless would not be able to exercise a right of subrogation against any defendants who are express or implied coinsureds under the Bissons' fire insurance policy. *See id.* ("[A]n insurer cannot recover by means of subrogation against its own insured. . . .  This prohibition extends to

---

[13]  As the Vermont Supreme Court noted in *Hall*, not all courts hold that the collateral-source rule applies to actions in contract. *Id.* In neighboring New York, for example, the collateral-source rule is confined to torts. *See Inchaustegui v. 666 5th Ave. Ltd. P'ship*, 749 N.E.2d 196, 200 & n.4 (N.Y. 2001). Nevertheless, Vermont law applies in this case, and thus the contractual basis for the Bissons' claim against the Reppels is not a basis for withdrawing the benefit of the collateral-source rule.

coinsureds under the policy, both express and implied." (citations and internal quotation marks omitted)).[14]

Thus the antisubrogation rule generally prohibits the *insurer* from recovering against any of its insureds.[15]  Here of course there is no insurer to which that rule might apply; again, this is not a subrogation case.  But the Reppels insist that the implied-coinsured doctrine prevents the Bissons from recovering against them because "a landlord has no cause of action against a tenant where the parties' reasonable expectation was that the landlord would purchase insurance for their mutual benefit."  (Doc. 72 at 6 (citing *Joerg*, 2003 VT 27, ¶ 10).)

### B.    No Defendant is an Implied Coinsured; the Collateral-Source Rule Applies

As the name of the collateral-source rule suggests, the rule only applies when the payment that the plaintiff receives was from a *collateral* source—i.e., a source "wholly independent" from the defendants.  *Hall*, 143 Vt. at 144, 465 A.2d at 227; *see also Schulman v. Saloon Beverage, Inc.*, No. 2:13-cv-193, 2014 WL 1883730, at *5 (D. Vt. May 12, 2014) (noting that a source is not "collateral" just because it is an insurer, and that it is necessary to determine whether the insurer "appears on the tortfeasing side of

---

[14]  The Vermont Supreme Court has never labeled this rule the "antisubrogation rule," but it is commonly known by that name.  *See Ohio Cas. Ins. Co. v. Transcon. Ins. Co.*, 372 F. App'x 107, 111–12 (2d Cir. 2010) (discussing antisubrogation rule); *see generally* 16 Couch on Insurance § 224:1 (3d ed. 2014) (articulating general principles of the antisubrogation rule).

[15]  Some authorities also hold that, where the insurer is the "real party in interest," the antisubrogation rule "precludes an *insured* from interposing a claim directly against a coinsured."  16 Couch on Insurance § 224:5 (3d ed. 2014) (emphasis added); *see also Ambrosi v. 1085 Park Ave. LLC*, No. 06-CV-8163(BSJ), 2008 WL 4386751, at *11 (S.D.N.Y. Sept. 25, 2008) (applying New York law).  Here it is undisputed that Peerless has waived subrogation; it is not a real party in interest.

the equation").  Here, the parties disagree as to whether Peerless is wholly independent from Defendants.  Generally, the parties disagree as to whether Defendants are implied coinsureds, whether that status has meaning in a non-subrogation case, and whether the application of the collateral-source rule even depends on whether Defendants are implied coinsureds.

Specifically, the Reppels contend that, under the terms of the Lease, they are implied coinsureds under the Policy, and that the collateral-source rule is therefore inapplicable.  (Doc. 72 at 9–13.)  The Bissons maintain that the implied-coinsured doctrine is restricted to subrogation cases, and that even if the doctrine did apply, Defendants do not qualify as implied coinsureds.  (Doc. 67 at 7.)  The Bissons further contend that even if the implied-coinsured doctrine applies and Defendants are implied coinsureds, Peerless's payments to the Bissons are still collateral-source payments.  (*See* Doc. 77 at 8–9.)

Vermont has "declined to adopt the so-called *Sutton* rule, followed in a number of jurisdictions, which provides that a tenant is, per se, a coinsured under a landlord's fire insurance policy unless the parties expressly agree otherwise." *Town of Stowe v. Stowe Theatre Guild*, 2006 VT 79, ¶ 6, 180 Vt. 165, 908 A.2d 447 (citing *Joerg*, 2003 VT 27, ¶¶ 7–9).  Instead, Vermont has adopted "a more flexible, case-by-case approach, holding that a tenant's liability to the landlord's insurer for negligently causing a fire depends on the intent and reasonable expectations of the parties to the lease as ascertained from the lease as a whole." *Joerg*, 2003 VT 27, ¶ 8.  The Court's analysis of the Lease as a whole,

*supra*, indicates that the Reppels could have no reasonable expectation that the Bissons would purchase insurance for their mutual benefit.

Thus, the Court concludes that no Defendant is an implied coinsured under the Policy.  It is unnecessary to decide whether in Vermont implied-coinsured status has meaning outside the context of subrogation, or whether implied-coinsured status might render Peerless a non-collateral source.  It is also unnecessary—despite Yared's apparent invitation to the contrary (*see* Doc. 74 at 5)—to certify those questions to the Vermont Supreme Court under Local Rule 74.  Since no Defendant is an implied coinsured, and since there is no indication or suggestion that any Defendant is an express coinsured, each Defendant is wholly independent from Peerless, and the collateral-source rule applies.

### C.      The Collateral-Source Rule is Not Limited to Subrogation Cases

The Court rejects Yared's contention (Doc. 74 at 4) that the collateral-source rule is inapplicable in the absence of subrogation.  The scope of the collateral-source rule certainly includes "cases where the collateral source would be recompensed from the total recovery through subrogation, refund or some other arrangement."  *My Sister's Place v. City of Burlington*, 139 Vt. 602, 613, 433 A.2d 275, 281 (1981).[16]  But the rule is not *limited* to those circumstances; it also applies where an injured party receives compensation "through insurance, unemployment benefits or similar compensation

---

[16]   Indeed, as this Court has noted, the collateral-source rule and the concept of subrogation are closely related, since one of the stated rationales for the collateral-source rule is to preserve the subrogation rights of insurers.  *Schulman*, 2014 WL 1883730, at *6 n.10.

yielded because the plaintiff actually or constructively paid for it." *My Sister's Place*, 139 Vt. at 613, 433 A.2d at 281.  Here, the Bissons have received compensation through insurance—that is a basis for the application of the collateral-source rule.

Thus, the fact that this case does not involve subrogation does not make the collateral-source rule inapplicable. *See Helfend v. S. Cal. Rapid Transit Dist.*, 465 P.2d 61, 67–68 (Cal. 1970) ("Even in cases in which the contract or the law precludes subrogation or refund of benefits, or in situations in which the collateral source waives such subrogation or refund, the [collateral-source] rule performs entirely necessary functions in the computation of damages." (footnote omitted)); *Maduff Mortg. Corp. v. Deloitte Haskins & Sells*, 779 P.2d 1083, 1087 (Or. Ct. App. 1989) (rejecting argument that collateral-source rule is inapplicable when insurer has surrendered its subrogation rights); *Voge v. Anderson*, 512 N.W.2d 749, 751–52 (Wis. 1994) (collateral-source rule applied despite insurer's waiver of subrogation).

*Lambert v. Wrensch* does not advance Yared's argument.  In that case, the insurer had not waived subrogation, but was barred from pursuing a subrogation claim because it had failed to pursue subrogation before the applicable statute of limitations expired.  399 N.W.2d 369, 371 (Wis. 1987).  As the Wisconsin Supreme Court later clarified, the proper characterization of the holding in *Lambert* is that "'where the insurer is barred from pursuing a claim [of subrogation], the tortfeasor is entitled to a reduction in judgment for the amount of that claim.'"  *Koffman v. Leichtfuss*, 2011 WI 111, ¶ 39, 246 Wis. 2d 31, 630 N.W.2d 201 (quoting *Voge*, 512 N.W.2d at 749).  This case does not fit

within that narrow holding: here it is undisputed that Peerless has waived subrogation; there is no indication that Peerless's subrogation rights were barred by operation of law.[17]

For all these reasons, the Court predicts that the Vermont Supreme Court would not hold the collateral-source rule inapplicable just because this is not a subrogation case. This conclusion makes sense from a policy perspective because preserving an insurer's subrogation rights is not the only rationale for the collateral-source rule. *See* 1 Dan B. Dobbs, *Law of Remedies* § 3.8(1), at 374–76 (2d ed. 1993) (discussing various rationales for the collateral-source rule, including the rationale that plaintiff paid for the collateral benefit that he received). Indeed, the Vermont Supreme Court has opined that the "foremost" policy goal of the collateral-source rule is that "a defendant should be required to pay for his or her wrongdoing." *Windsor Sch. Dist.*, 2008 VT 27, ¶ 34.

Applying the collateral-source rule in this non-subrogation case does appear to raise the possibility of a double recovery. But that alone is not a sufficient reason to deny the operation of the collateral-source rule. *See id.* ¶ 39 (rejecting argument that the collateral-source rule should not allow double recovery); *see also Voge*, 512 N.W.2d at 752 (recognizing that application of collateral-source rule resulted in a double recovery in that case, but reasoning that a contrary conclusion would result in a windfall for the wrongdoer).[18]

---

[17] It is therefore unnecessary to predict whether Vermont might adopt *Lambert*'s narrow holding, or whether instead Vermont might adopt the rule in *Helfend*, under which the collateral-source rule applies even where the law precludes subrogation.

[18] Nor is double recovery by any means a certainty. To recover in this litigation, the Bissons will have to prove Yared's negligence. That issue remains in dispute; the Reppels maintain that the Bissons will not be able to prove causation. (*See* Doc. 98 at 4.)

### D.    Evidentiary Implications of the Collateral-Source Rule

As noted above, the collateral-source rule is a rule of evidence in addition to a rule of damages.  The rule's evidentiary aspect precludes "'introduction of evidence regarding benefits a plaintiff obtained from sources collateral to the tortfeasor.'"  *Melo*, 800 F. Supp. 2d at 600 (quoting *Leitinger*, 2007 WI 84, ¶ 30, 736 N.W.2d 1).  Yared argues, however, that barring introduction of evidence of insurance would unfairly deprive Defendants of the opportunity: (1) to argue that the Bissons' claimed damages are inconsistent with their insurer's appraisal of the value of their property (Doc. 74 at 5); (2) to argue mitigation of damages (Doc. 80 at 3); and (3) to defend on liability (*id.*).

### 1.    Liability—Causation

Yared alleges that, after the fire, the Bissons accused Peerless of "failing to preserve the fire scene" and threatened to sue Peerless for prejudicing their ability to prove causation.  (*Id.*)  Yared wants to use those facts on cross-examination to attempt to undermine the Bissons' case on the element of causation.  (*Id.*)  The Court concludes, however, that since the collateral-source rule applies, Yared cannot introduce evidence of insurance.  *See Ronay's Famous Shoes, Inc. v. St. Peter*, 143 Vt. 319, 321, 465 A.2d 1388, 1389 (1983) ("[T]he deliberate injection of insurance into a case in order to prejudice a jury and benefit a litigant is normally reversible error since the existence of insurance is an immaterial fact . . . ." (internal quotation marks omitted)).  Yared of course remains free to explore the issue of causation, and to point to the absence of physical evidence at the fire scene, provided that he does not inject the issue of insurance into the case.

### 2.    Damages

Yared contends that the Bissons' damages claim is inconsistent with Peerless's "appraisal of the value of their property," (Doc. 74 at 5), which the Court understands from Yared's Supplemental Opposition to mean "the $115,000.00 price to rebuild the dwelling negotiated between Plaintiffs' insurance company and Plaintiffs' disclosed expert builder, G.W. Savage." (Doc. 80 at 2.) Here, too, there is no basis for allowing Yared to inject evidence of insurance into the case to argue against the Bissons' damages claim. Yared is free to challenge the Bissons' case on damages as long as he refrains from mentioning the issue of insurance.

### 3.    Mitigation of Damages

Yared alleges that the Bissons are seeking "lost rental income from the date of the fire through the present and continuing." (Doc. 80 at 2.) Yared wants to argue that the Bissons failed to mitigate those alleged damages because they failed to apply the proceeds they obtained from Peerless to timely rebuild and re-rent their property. (*See id.*) Again, since the collateral-source rule applies, Yared cannot introduce evidence of benefits the Bissons received from Peerless in the course of making his failure-to-mitigate argument. He may argue failure to mitigate damages provided that he makes no mention of the Bissons' insurance.

### <u>Conclusion</u>

For the reasons stated above, the Bissons' Motion to Substitute (Doc. 97) is GRANTED with respect to the amended responses to which the Reppels do not specifically object, and the Reppels' Motion for Summary Judgment (Doc. 89) is

DENIED.  The Bissons' Insurance Motion (Doc. 67) is GRANTED.  Defendants are not entitled to any setoff for insurance payments received by the Bissons.  Subject to developments at trial, evidence regarding benefits that the Bissons obtained from Peerless shall not be admitted.

Dated at Burlington, in the District of Vermont, this 12th day of February, 2015.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge